UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| UNITED STATES OF AMERICA, | Case No. 3:18-cr-00080-LRH-WGC |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| DENIS ARNULFO ANDINO-MATAMOROS, | |
| Defendant. | |

Defendant Denis Arnulfo Andino-Matamoros has filed a motion to dismiss his indictment, which had charged him with illegal reentry by a previously deported alien. (ECF No. 16). The government responded (ECF No. 18), and defendant timely replied (ECF No. 22). Defendant also filed a supplemental brief in support of his motion to dismiss following the government's production of the audio recording of one of his immigration hearings. (ECF No. 25). The government then moved to strike defendant's supplemental filing. (ECF No. 27). For the reasons stated below, the Court will deny the government's motion to strike and deny defendant's motion to dismiss.

**I. Factual Background**

Defendant, a Honduran national, first entered the United States on April 1, 2005, at or near San Ysidro, California. (ECF No. 16-1 at 3). He was subsequently discovered by Immigration and Customs Enforcement ("ICE") in El Paso, Texas, and on May 3, 2005, was served with a Notice to Appear ("NTA") before an immigration court for unlawfully entering the United States. (ECF No. 16 at 2) An NTA is a document that the government sends to an alien that instructs the alien

to appear before an immigration judge at a specific place, date, and time to determine if the alien should be removed from the United States. Defendant's NTA charged him with entering the United States without being admitted or paroled following an inspection by an immigration officer, a violation of §212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"). (ECF No. 16-1 at 3). Defendant appeared for his hearing on June 28, 2005, and he appeared at each of the five subsequent hearings as his case was continued multiple times. (ECF No. 18 at 2). On August 24, 2005, an immigration judge granted a request to transfer defendant's proceedings from San Antonio to Houston because he had recently relocated there. (*Id.*) Defendant received three separate notices of his removal hearing during his time in Houston, but his case was eventually transferred back to San Antonio in January 2006. (*Id.* at 2–3). On February 13, 2006, an immigration judge dismissed defendant's case without prejudice because his "whereabouts [were] unknown." (ECF No. 16-2 at 3). Defendant resurfaced two years later in Miami, Florida, when he pleaded guilty to possession of 20 or more grams of marijuana. (ECF No. 16 at 2). Several months later, he also pleaded guilty for possession of a stolen or fictious driver's license. (*Id.*) Based on these offenses, ICE located him in a Miami-Dade County jail and lodged an immigration detainer on him. (*Id.*) On November 10, 2008, he was released into ICE custody. (*Id.* at 3).

      Two days later on November 12, 2008, defendant received an NTA that charged him with several removable offenses: (1) the previous offense of not being admitted or paroled into the United States following an inspection by an immigration officer; (2) not being in possession of any valid entry documents as required by the INA; and (3) being convicted of the narcotics offense in Miami. (ECF No. 16-4 at 2). Although the NTA listed the address of the immigration court in Harlingen, Texas, it did not list the date or time for the hearing. (*Id.*) At the time he received the NTA, defendant was being held in ICE custody at the Willacy Detention Center in Raymondville, Texas. (*Id.*) While still in ICE custody, defendant, along with several other aliens, appeared via video feed before an immigration judge in San Antonio on December 8, 2008. During the hearing, Defendant was advised that he was allowed to be represented by an attorney if he could procure one, provided a list of legal aid organizations that could potentially represent him for free or at a

reduced cost, and told that he would be given a continuance if he wished to hire a lawyer.[1] He was also informed that he could be eligible for voluntary departure if he could arrange and pay for his own transportation back to his home country. During another alien's hearing, the immigration judge explained several aspects of voluntary departure to the group as a whole, telling them that anyone granted voluntary departure who fails to leave the United States within the allotted time would have an order of removal entered against them. They would also be subject to a civil penalty and become ineligible for voluntary departure for ten years. During defendant's hearing before the immigration judge, he admitted that he was subject to removal because he entered the country illegally, did not have valid immigration documents, and had committed a marijuana offense in Miami. Defendant stated that he wanted to apply for voluntary departure, but the government objected based on his criminal history. Because of the government's objection, the immigration judge set defendant's voluntary departure hearing for January 23, 2009, at 9:00 am. Defendant received written notice for the hearing the same day.

Defendant once again appeared via video feed for his January 23 hearing. At the hearing, the immigration judge stated that defendant needed to prove that he deserved voluntary departure as a matter of discretion.[2] The judge also stated that defendant could either present his evidence as to why he should be granted voluntary departure or withdraw his application and have a removal order entered against him. Defendant replied by stating that he wanted voluntary departure but did not have the means to pay for it. When questioned by the immigration judge, defendant confirmed that he did not have the means to pay for his way back to Honduras. The immigration judge then informed defendant that he would be detained while he arranged for transportation back to Honduras. Defendant replied by saying that he wanted to withdraw his application for voluntary departure. The immigration judge granted defendant's request and ordered that he be deported. Following defendant's removal to Honduras, he unlawfully reentered the United States on June 19, 2009, January 2, 2014, and March 26, 2015, and he was removed each time. (ECF No. 18 at 4).

///

---

[1] Although no transcript exists of the hearing, the government provided the Court with a CD containing a complete audio file of it. (ECF No. 34).

[2] There is also no transcript of this hearing, but the Court was provided with another CD.

1    Defendant was indicted on September 12, 2018, for a fourth alleged illegal reentry into the United States after having been previously deported. (ECF No. 1). He now seeks to dismiss the indictment against him.

## II. Legal Standard

8 U.S.C. §1326(d) allows for an alien criminally charged under §1326(a) for illegal reentry to challenge the validity of the predicate removal order, but only if: (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair. To establish the third requirement, an order of removal is fundamentally unfair if defects in the proceedings violated the alien's right to due process and he suffered prejudice as a result. *U.S. v. Aguilera-Rios*, 769 F.3d 626 (9th Cir. 2014). Under Ninth Circuit caselaw, a defendant can satisfy all three requirements by establishing that the immigration judge failed to inform him of his apparent eligibility for relief and that he had plausible grounds for relief. *U.S. v. Rojas-Pedroza*, 716 F.3d 1253, 1262 (9th Cir. 2013).

## III. Discussion

Defendant seeks dismissal of his indictment on two separate grounds. First, he argues that the immigration judge misadvised and "affirmatively misled" him about his eligibility for voluntary departure because he told defendant that he would have to pay for his own removal. (ECF No. 16 at 8). Second, and in the alternative, defendant argues that pursuant to a recent Supreme Court case, *Pereira v. Sessions*, the immigration court lacked jurisdiction over his removal proceedings because the December 8, 2008 NTA did not list the date or time of his removal hearing. (*Id*. at 10). Following the close of briefing, the government submitted the audio recording of defendant's January 23, 2009 voluntary departure hearing. Defendant filed a supplemental brief following the disclosure of the recording (ECF No. 25), but the government filed a motion to strike the supplementation, arguing that defendant merely repeated arguments made in his motion to dismiss. (ECF No. 27). The Court will address the government's motion to strike first.

4

## A. The Government's Motion to Strike

In its motion to strike, the government seeks to strike defendant's supplemental filing in support of his motion to dismiss. The United States argues that defendant merely repeats several arguments that he previously made in his motion to dismiss and that his sole new argument is not supported by the record. (ECF No. 27 at 1). In response, defendant argues that he had previously requested leave to supplement in his motion to dismiss and that the government failed to cite to any applicable law in requesting that his supplementation be stricken. (ECF No. 28 at 1–2). Federal Rule of Civil Procedure 12(f) gives the Court discretion to strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The Court may also strike arguments made for the first time in reply briefs because the opposing party is deprived of an opportunity to respond. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996); *Tovar v. U.S. Postal Service*, 3 F.3d 1271, 1273 n.3 (9th Cir. 1993).

Here, the Court will not strike defendant's supplementation. As an initial matter, although defendant requested leave to file a supplement, he did so within his motion to dismiss, and the Court never granted his request. Local Rule 7-2(g) prohibits parties from filing supplementations without first obtaining leave of the Court. Defendant should have filed a separate motion and explained why he had good cause to supplement his motion to dismiss if he wanted to comment on any new information he learned from the January 23, 2009 audio recording. He did not. But even so, defendant had proper grounds to file a supplemental memo following government disclosure of the January 23, 2009 immigration hearing. The audio recording of that hearing was not available to defendant (or the government) before the close of the briefing schedule. Therefore, he will be allowed to supplement his argument based on what was contained on the audio recording.

## B. Defendant's Eligibility for Voluntary Departure

Defendant first argues that his January 2009 removal was invalid because the immigration judge did not properly inform him of the requirements for voluntary departure. Defendant's chief complaint is that the immigration judge improperly found that because he did not have the money to pay for his own way back to Honduras, he was not eligible for pre-conclusion voluntary

departure. (ECF No. 16 at 7). He also accuses the immigration judge of having "affirmatively misled" him regarding his eligibility for pre-conclusion voluntary departure. (*Id.* at 8).

There are two types of voluntary departure available once removal proceedings have been initiated – pre-conclusion and post-conclusion. As the name implies, an alien may apply for pre-conclusion voluntary departure before the conclusion of his removal proceedings, usually at his master calendar hearing. *In re Arguelles-Campos*, 22 I. & N. Dec. 811, 813 (BIA 1999) (hereinafter *Arguelles-Campos*). To be eligible for pre-conclusion voluntary departure, an alien must: (1) waive or withdraw all other requests for relief (i.e. asylum); (2) concede that he is removable; (3) waive appeal on all issues; and (4) not have been convicted of an aggravated felony or a terrorism-related charge. *Arguelles-Campos*, 22 I. & N. Dec. at 815; 8 C.F.R. §1240.26(b)(1)(i). The alien is also required to present a passport or other travel document "sufficient to ensure lawful entry into the county to which the alien is departing" unless a travel document is not necessary for that country or it is already in the government's possession. 8 C.F.R. §1240.26(b)(3)(i). Moreover, there is no requirement that the alien show that he has the financial means to depart at the master calendar hearing, but the alien will ultimately be responsible for securing and paying for transportation back to his country of origin. *Arguelles-Campos*, 22 I. & N. Dec. at 817; 8 U.S.C. §1229c(a)(1).

The requirements for post-conclusion voluntary departure are more stringent. To qualify for post-conclusion voluntary departure, an alien must demonstrate that: (1) he has been physically present in the United States for at least one year preceding the date he was served with the NTA; (2) he has been a person of good moral character for at least five years preceding the application for voluntary departure; (3) he has not been convicted of an aggravated felony or terrorism-related offense; and (4) he has the financial means to depart the United States and intends to do so. *Arguelles-Campos*, 22 I. & N. Dec. 811, 817 (BIA 1999); 8 U.S.C. §1229c(b)(1). The fourth requirement must be satisfied with clear and convincing evidence. *Id*. Regardless of which type of voluntary departure the alien seeks, whether or not his request is granted rests within the sound discretion of the immigration judge. *Arguelles-Campos*, 22 I. & N. Dec. at 817; 8 C.F.R. §1240.26(b).

In this case, the record and hearing recordings reflect that defendant asked for voluntary departure during his master calendar hearing on December 8, 2008. This would make his request one for pre-conclusion voluntary departure, and the evidence indicates that he was qualified for it. During his interaction with the immigration judge, defendant admitted that he was removable for any one of the three offenses listed on his NTA, he did not have any pending alternative requests for relief, he agreed to waive appeal, and he had not been convicted for any aggravated felonies or terrorism-related offenses. Thus, he was eligible for pre-conclusion voluntary departure. At the December 8 hearing, the government objected to defendant's request based on his criminal history. Because of the government's objection, the immigration judge set a voluntary departure hearing for January 23, 2009. Defendant's main contention is that at the January 23 hearing, the immigration judge "mislead" him into believing that he needed to provide proof that he had the financial means to qualify for pre-conclusion voluntary departure. (ECF No. 16 at 7–8). He argues that because the immigration judge purportedly misstated the requirements of pre-conclusion voluntary departure, the judge failed to inform him of his "apparent eligibility" for relief, and as such, he is exempt from having to demonstrate the first two elements of §1326(d).

These allegations find no support in the record. At no time during the January 23 hearing did the immigration judge tell defendant that he was required to prove that he had the financial means to procure transportation back to Honduras. Instead, the immigration judge correctly stated what defendant, having already qualified for voluntary departure (hence the present hearing), had to do to obtain it:

> Defendant: The thing is that I don't have a way to be able to provide proof that I've been here for voluntary departure.
>
> Immigration Judge: Well sir, you don't need to prove that you've been here for voluntary departure. You just need to prove that you deserve voluntary departure as a matter of discretion. So you have two choices. You can withdraw your application for voluntary departure and I'll order you removed today. Or you can go forward with your application for voluntary departure and present your evidence as to why you should be granted voluntary departure as a matter of discretion.

In fact, it was defendant, not the immigration judge, who first raised the issue of finances:

> Defendant: I would like voluntary departure, but the thing is that I don't have the means to pay for it.
>
> Immigration Judge: To pay for what?
>
> Defendant: For voluntary departure.
>
> Immigration Judge: You mean you don't have a way to pay for your transportation back to Honduras?
>
> Defendant: No I do not.
>
> Immigration Judge: Well let's say you had a hearing on your application and it was granted. And I granted you 30 days to voluntarily depart the United States. And I'm certainly not saying that I would grant your application, but let's suppose that I did grant it. That would be under safeguards and you would be detained there until you could make your own arrangements and pay for your transportation back to Honduras. Are you aware of that?
>
> Defendant: If I do ask for deportation, would I be deported?
>
> Immigration Judge: Well I would order you today if you don't want to apply for voluntary departure. How soon the government would remove you to Honduras I could not say. That's up to them.
>
> Defendant: Can I be deported?
>
> Immigration Judge: Do you want to withdraw your application for voluntary departure?
>
> Defendant: Yes.
>
> Immigration Judge: Alright, I order you removed to Honduras. Do you accept that decision as final?
>
> Defendant: Yes.

Defendant's statements demonstrate that he knew that he had to pay for transportation to Honduras. Instead of arguing his case for why he should have been given voluntary departure, defendant willingly chose to withdraw his application for it. It is unclear from the audio recording exactly why defendant did so, and he does not provide any explanation in his written submission. Defendant's argument that the immigration judge imposed a monetary requirement on him is belied by the judge's statement of "[w]ell let's say you had a hearing on your application and it was granted." His statement came directly after defendant confirmed that did not have the means to pay for transportation to Honduras. The statement demonstrates that despite defendant confirming he could not pay, the immigration judge was still considering granting his application for voluntary departure. This is not a situation where, as defendant appears to suggest, the

8

immigration judge denied his application for voluntary departure because he could not pay or where the immigration judge tricked him into believing that it was a requirement. Instead, defendant voluntarily withdrew his application after learning that he would be held in a detention center while he arranged for his own transportation to Honduras. At no time during either the December 8 or January 23 hearings did the immigration judge misstate the operative law.

In his supplement, defendant argues that he was not advised of his right to counsel during his January 23, 2009 hearing. (ECF No. 25 at 7–8). Defendant is correct; he was not advised of his right to counsel during *that* hearing. But the audio recording of the December 8, 2009 hearing indicates that defendant was advised of his right to counsel then and provided a list of organizations that may have represented him for free or at a reduced cost. He was also given the opportunity to ask for a continuance to procure and consult with counsel. Instead of asking for a continuance, he chose to proceed with his master calendar hearing and admitted removability to the immigration judge for the three reasons listed in his NTA. His challenge that he was not informed of his right to counsel is not supported by the evidence in the record or the audio recordings of the hearings.

But even if the immigration judge's conduct could somehow be construed as failing to inform defendant of his avenues for relief or even misleading him, defendant would still need to demonstrate the third requirement of 8 U.S.C. §1326(d), prejudice. In this context, an alien can establish prejudice by demonstrating "plausible grounds" for relief. *U.S. v. Gonzalez-Valerio*, 342 F.3d 1051, 1054 (9th Cir. 2003) (citing *U.S. v. Jimenez-Marmolejo*, 104 F.3d 1083, 1086 (9th Cir. 1996)). He can demonstrate "plausible grounds" for relief by showing that the facts presented before the immigration judge would cause the Attorney General to exercise discretion in his favor. *U.S. v. Rojas-Predoza*, 716 F.3d 1253, 1263 (9th Cir. 2013). Once the defendant makes a prima facie showing of prejudice, the burden shifts to the government to demonstrate that the procedural violation could not have changed the proceedings' outcome. *Id*. (citing *U.S. v. Gonzalez-Mendoza*, 985 F.2d 1014, 1017 (9th Cir. 1993)). In exercising his discretion on a voluntary departure application, the immigration judge should take both favorable and unfavorable factors into account. *Id*. (citing *Matter of Gamboa*, 14 I. & N. Dec. 244, 248 (BIA 1972)). Favorable factors include long residence, close family ties to the United States, and humanitarian needs. *Id*. (citing

*Arguelles-Campos*, 22 I. & N. Dec. 811, 817 (BIA 1999)). Unfavorable factors include "the nature and underlying circumstances of the deportation ground at issue, additional violations of the immigration laws, the existence, seriousness, and recency of any criminal record, and any other evidence of bad character or the undesirability of the applicant as a permanent residence. *Id*. (citing *Arguelles-Campos*, 22 I. & N. at 817).

Based on these factors, it is hard to conclude that it would have been plausible for the immigration judge to exercise his discretion in favor of defendant. Defendant does not possess any of the positive equities listed above. Defendant had not been living in the United States long prior to his eventual deportation[3] (roughly two years), and there is no evidence to indicate that he had any family ties in the United States at the time of his removal. He has also not identified any specific humanitarian needs present at his 2009 deportation. But what is present, however, are several unfavorable factors. In the months leading up to his deportation, defendant had two very recent convictions, one for possession of narcotics and one for possessing a stolen or fictious driver's license. Additionally, shortly after defendant entered the United States, he was placed into removal proceedings, and he attended all the hearings. (ECF No. 18 at 2). But in January 2006, the proceedings were terminated because defendant's whereabouts were unknown. (*Id*.) While there is no definitive evidence to suggest that defendant fled from his proceedings, the fact that he attended each of his six hearings throughout the summer of 2005 but then disappeared from the government's radar until his arrests in Miami in 2008 raises an inference that he purposefully chose to stop attending his hearings. In his written submissions, defendant does not mention his multiple removal proceedings from 2005 nor does he explain why he did not attend his hearings after August 2005. This is despite the fact that he received several notices from the government informing him about his hearings at multiple addresses.

To support his prejudice argument, defendant cites to several cases where aliens with criminal records worse than his received voluntary departure. (ECF No. 16 at 8–10). *See, e.g., Matter of Gamboa*, 14 I. & N. Dec. 244 (BIA 1972) (granting voluntary departure to couple where

---

[3] Moreover, the first removal offense defendant was charged with was a reinstatement of the previous 2005 charge. At that point, defendant had only been in the United States for less than a month.

the wife was relatively young, pregnant, and had no previous immigration history); *In re Gonzales-Figeroa*, 2006 WL 729784 (BIA Feb. 10, 2006) (granting voluntary departure to an illegal alien with four assault convictions, a conviction for resisting arrest, and "numerous" arrests); *In re Pineda-Castellanos*, 2005 WL 3833024 (BIA Nov. 16, 2005) (affirming grant of voluntary departure to an alien with "at least six" criminal convictions for illegal entry, battery, drunkenness, threatening, a second battery, and DUI).[4] But what defendant overlooks, however, is that an immigration judge is tasked with looking at *all* the positive and negative equities, not just an alien's criminal history. Defendant makes the identical argument of the defendant in a relatively recent Ninth Circuit case, *U.S. v. Rojas-Pedroza*, 716 F.3d 1253 (9th Cir. 2013). There, like defendant here, the defendant attempted to argue that a grant of voluntary departure was plausible because the BIA had previously granted voluntary departure to aliens who had far worse criminal histories than he did. *Id*. at 1265–66. But as the Ninth Circuit noted, the aliens in many of the cases he cited had strong family ties to the United States and other positive equities that he lacked. *Id*. at 1266. As a result, the Ninth Circuit held that the defendant could not establish plausible grounds for relief and denied his appeal. *Id*.

This is the same case here. In the relevant cases that defendant cites, the aliens had positive equities that balanced out their criminal histories, usually in the form of significant family contacts in the United States. *See Matter of Gamboa*, 14 I. & N. Dec. 244 (BIA 1972) (one of the aliens was young, pregnant, and had no previous immigration violations); *In re Gonzales-Figeroa*, 2006 WL 729784 (BIA Feb. 10, 2006) (the alien's mother was a lawful permanent resident of the United States, and his two nieces were American citizens); *In re Pineda-Castellanos*, 2005 WL 3833024 (BIA Nov. 16, 2005) (alien's spouse was a lawful permanent resident, and his three children were American citizens).[5] *See also U.S v. Rojas-Pedroza*, 716 F.3d 1253, 1265–66 (9th Cir. 2013) (collecting cases). And as the Court illustrated above, defendant did not have any positive equities

---

[4] In the same section, defendant also cites to several cases where the BIA remanded a case back to the immigration judge because of a procedural mistake or error of law. (ECF No. 16 at 9–10). The Court has reviewed these cases and it does not find them relevant to the matter at hand. None of these cases contain any discussion about whether a grant of voluntary departure to a particular alien was proper or not.

[5] In *Pineda-Castellanos*, the BIA even noted that the immigration judge's decision to grant voluntary departure was "more than generous" in light of the alien's criminal history. *Pineda-Castellanos*, 2005 WL 3833024 at *2.

at the time of his first removal from the United States including no known family members also present in the country. The evidence before immigration judge amounted to that defendant had two very recent criminal convictions, no known family within the United States, and did not show up to his most recent prior removal hearings. It is thus unlikely that the immigration judge would have chosen to exercise his discretion to grant defendant voluntary departure.

In conclusion, defendant has not demonstrated that the immigration judge failed to inform him of his apparent eligibility for relief or that it was plausible that the immigration judge would have exercised his discretion in favor of granting defendant voluntary departure. The latter results in defendant being unable to show that he was prejudiced by his removal proceeding. Because, at a minimum, defendant cannot show that he suffered prejudice, he cannot demonstrate that his original removal order was "fundamentally unfair," and he cannot satisfy §1326(d)(3)'s requirement. *U.S. v. Ubaldo-Figueroa*, 364 F.3d 1042, 1048 (9th Cir. 2004). The Court will therefore deny defendant's motion to dismiss his indictment on this ground.

### C. *Pereira v. Sessions*

Defendant's second argument concerns a recent Supreme Court case, *Pereira v. Sessions*, 138 S. Ct. 2105 (2018) (hereinafter *Pereira*), and its holding's applicability to his case. He argues that because *Pereira* held that "a putative notice to appear…is not a notice to appear" and his November 12 NTA did not list date and time of his removal hearing, the immigration judge never had jurisdiction over him in December 2008, and thus his January 2009 removal order is invalid. (ECF No. 16 at 10–11). Because there was no valid removal order, he continues, there was no valid deportation, and the current indictment for unlawful reentry must be dismissed. (*Id*. at 11).

Before turning to the merits of defendant's argument, a brief discussion of *Pereira* is needed. There, the Supreme Court was faced with the question of whether an NTA that fails to designate the time and place of a removal hearing is sufficient to trigger the stop-time rule of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). 138 S. Ct. 2105, 2110 (2018). In *Pereira*, the petitioner, an alien who overstayed his visa, was arrested for a DWI in 2006, six years after having been admitted to the United States. *Id*. at 2112. He was served with an NTA charging him with overstaying his visa, but it did not include the date or time of his

removal hearing. *Id*. In 2007, the government attempted to serve him with an updated NTA with the date and time, but the petitioner never received it because it was sent to a wrong address. *Id*. As a result, he did not show up to his removal hearing and was ordered removed in absentia. *Id*. The petitioner remained in the United States until 2013 when he was arrested for a traffic violation and placed into deportation proceedings. *Id*. The immigration court reopened the removal proceedings after the petitioner demonstrated that he never received the updated 2007 NTA, but nevertheless, it denied his application for cancellation of removal based on the stop-time rule. *Id*. Aliens subject to removal proceedings and having accrued ten years of continuous presence in the United States are eligible for cancellation of removal, which is a form of discretionary relief. 8 U.S.C. §1229b(b)(1). But under the stop-time rule, the continuous presence is deemed to stop accruing when the alien is served with an NTA. 8 U.S.C. §1229b(d)(1)(A). In other words, if the petitioner had been served with a valid NTA in 2006, then he would have only accrued six years; had he never been served with a valid NTA, then he would have accrued thirteen years and would be eligible for cancellation of removal.

The Supreme Court held that an NTA that does not list the date, time, and place of the removal proceedings does not trigger the stop-time rule. *Pereira*, 138 S. Ct. 2105, 2110 (2018). It highlighted how 8 U.S.C. §1229b(d)(1)(A), the stop-time rule provision, makes a direct reference to §1229(a), which states that NTAs should contain "[t]he time and place at which the [removal] proceedings will be held." *Id*. at 2114. Based on the plain text of the statute, then, an NTA that does not contain the time and place of the removal proceedings cannot trigger the stop-time rule. *Id*. The Supreme Court also explained that "[c]onveying such time-and-place information to a noncitizen is an essential function of a notice to appear, for without it, the Government cannot reasonably expect the noncitizen to appear for his removal proceedings." *Id*. at 2115. A contrary finding would, in the Supreme Court's view, allow the government to trigger the stop-time rule by sending faulty NTAs knowing that the alien would be unlikely to show up at his removal hearing. *Id*.

Following a close reading of *Pereira*, the Court disagrees with defendant that the case is applicable in this matter. Defendant's argument essentially seeks to extend *Pereira*'s holding to

13

encompass all NTAs in all types of removal proceedings, not just those concerning the stop-time rule. He would also seek to extend it to situations where an alien receives an NTA without the date and time of the hearing, but a subsequent notice from the government provides all the required information, and the alien does in fact show up at his hearing. Defendant's calls to extend *Pereira*'s holding is contrary to the plain language of the Supreme Court's decision, which explicitly stated that the question before it was a "narrow" one. *Pereira*, 138 S. Ct. 2105, 2110 (2018). Had the Supreme Court wished its ruling to apply to all NTAs in all situations, it presumably would not have classified its own opinion as "narrow." But more importantly than the Court's own interpretation of *Pereira*, defendant's argument is foreclosed by persuasive reasoning from the Sixth Circuit and recent binding authority from the Ninth Circuit.

The Sixth Circuit rejected the same argument in a post-*Pereira* decision, *Hernandez-Perez v. Whitaker*, 911 F.3d 305 (6th Cir. 2018). In reaching its decision, the Sixth Circuit looked to the BIA's precedential post-*Pereira* decision in *Matter of Bermudez-Cota*, 27 I. & N. Dec. 441 (B.I.A. 2018), which held that an NTA that does not specify the time and place of an alien's initial removal still vests jurisdiction with the immigration judge so long as notice of that information is later sent to the alien. *Hernandez-Perez*, 911 F.3d at 312. The Sixth Circuit analyzed the BIA's interpretation of its own regulations under the *Auer* standard, which states that agency interpretations of their own regulations are controlling unless they are plainly erroneous or inconsistent with the regulation. *Id.*; *Auer v. Robbins*, 519 U.S. 452, 461 (1997). The Sixth Circuit noted that 8 U.S.C. §1229a(a)(1), the removal proceedings statute, does not explain how or when jurisdiction vests with the immigration judge or which NTA requirements are jurisdictional. *Hernandez-Perez*, 911 F.3d at 313. Because the statute did not address the issue of jurisdiction, the agency had some discretion in fashioning its own interpretation of it. *Id*. The Sixth Circuit concluded that the BIA's finding that a two-step notice process "is sufficient to meet the statutory notice requirements" was not inconsistent with the INA. *Id*. (citing *Bermudez Cota*, 27 I. & N. Dec. at 447). The Court finds the Sixth Circuit's reasoning here especially convincing because many Circuits have independently found the two-step notice process to be permissible. *See, e.g., Popa v. Holder*, 571 F.3d 890, 895–96 (9th Cir. 2009) (holding that an NTA "that fails to include the date and time of

an alien's deportation hearing, but states that a date and time will be set later, is not defective so long as a notice of the hearing is in fact later sent to the alien."); *Herrera-Orozco v. Holder*, 603 Fed. App'x. 471, 474 (6th Cir. 2015) (same); *Guamanrrigra v. Holder*, 670 F.3d 404, 409–10 (2d Cir. 2012) (same); *Gomez-Palacios v. Holder*, 560 F.3d 354, 359 (5th Cir. 2009) (same); *Dababneh v. Gonzales*, 471 F.3d 806, 809 (7th Cir. 2006) (holding that the immigration judge is not deprived of jurisdiction when the "two-step" procedure is used); *Haider v. Gonzales*, 438 F.3d 902, 907 (8th Cir. 2006) (same). None of these decisions were either explicitly or implicitly abrogated by *Pereira*, and defendant fails to address any of them in his written submission, including the binding Ninth Circuit precedent in *Popa*.

The Sixth Circuit also looked to the regulatory text itself. 8 C.F.R. §1003.14(a) states that "[j]urisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court." The Sixth Circuit noted how the regulations specify that a "charging document" needs to be filed before jurisdiction vests, not only by an NTA like the stop-time rule in *Pereira*. *Hernandez-Perez*, 911 F.3d 305, 313 (6th Cir 2018). An NTA is certainly a charging document, but the regulations also specify that so are "Notices of Referral to Immigration Judge" and a "Notice of Intention to Rescind and Request for Hearing by Alien." *Id*. (citing 8 C.F.R. §1003.13). Another regulation lists what information must be present in an NTA; conspicuously absent is a requirement that the time and date of the initial hearing be included. *Id*. Finally, the Sixth Circuit noted how the *Pereira* Court did not invalidate the petitioner's underlying removal proceedings. *Id*. at 314. It concluded that "[i]f *Pereira*'s holding applied to jurisdiction, there also would not have been jurisdiction in *Pereira* itself. But the Court took up, decided, and remanded *Pereira* without even hinting at the possibility of a jurisdictional flaw." *Id*.

Following the Sixth Circuit's opinion, the Ninth Circuit also ruled on the issue and came to an identical conclusion. In *Karingithi v. Whitaker*, 2019 WL 333335 (9th Cir. Jan. 28, 2019),[6] the Ninth Circuit joined with the Sixth Circuit in holding that *Pereira* "was not in any way concerned with the Immigration Court's jurisdiction." *Id*. at *2. In doing so, it echoed many of the

---

[6] *Karingithi* is a published opinion, but at the time of this order's entry, the federal reporter citation was unavailable.

15

same reasons espoused by the Sixth Circuit in *Hernandez-Perez. See id.* at *2 – 3. The Ninth Circuit also found the BIA's opinion in *Bermudez-Cota* to "easily meet" the applicable deferential standard afforded to agencies interpreting their own regulations. *Id*. at *4. Importantly, however, because the petitioner in *Karingithi* had received actual notice of the date and time of her removal hearing well in advance of it, the Ninth Circuit did not reach the question of whether jurisdiction vests if "she had not received this information in a timely fashion." *Id*.

Based on the Sixth Circuit's reasoning, the Ninth Circuit's binding opinion in *Karingithi*, and the Court's own interpretation of the operative statutes and regulations, the Court finds that *Pereira* is inapplicable in this case and has no relevance to an immigration court's jurisdiction. Therefore, the Court will reject defendant's jurisdiction argument.

But there is still one more wrinkle with defendant's case. While it is uncontested that defendant received an NTA without the date and time on November 12, 2008, it is unclear whether he received the notice of the date and time prior to his initial master calendar hearing on December 8. Both defendant (despite his having actual knowledge of the events) and the government appear to believe that he received notice on December 8, 2008, that his removal hearing was scheduled for the morning of January 23, 2009. But as the Court related in the first section of this order, defendant, while in custody at an immigration detention center, appeared via a video feed before an immigration judge for his master calendar hearing on December 8, 2008. At the time of his master calendar hearing, defendant had been in continuous immigration custody since being arrested by ICE November 10, 2008. Defendant's situation is thus different from the petitioner's in *Pereira* and the defendant in *Hernandez-Perez*; despite not knowing when the hearing was, defendant was never in any danger of missing it because he was in government custody and was not free to leave. But on the other hand, there is also no evidence to indicate that while defendant was in custody, he was either formally or informally told of when he would be appearing before the immigration judge. He did, however, receive sufficient notice of his January 23, 2009 voluntary departure hearing well in advance. (ECF No. 16-5 at 1).

There is little caselaw addressing proper notice to an alien who is being held in continuous immigration detention. As stated above, in *Karingithi*, the Ninth Circuit did not reach the question

16

of what happens in a situation where an alien did not receive the date and time of a removal hearing in a "timely fashion." *Karingithi v. Whitaker*, 2019 WL 333335, at *4 (9th Cir. Jan. 28, 2018). The situation before the Court appears to be the exact case that the Ninth Circuit commented on in *Karingithi*. In the cases the Court has found where an alien appeared for his immigration hearing via video feed, he always received a Notice of Hearing prior to his master calendar hearing. *See, e.g., U.S. v. Zapata-Cortinas*, 2018 WL 6061076, at *1 (W.D. Tex. Nov. 20, 2018); *U.S. v. Romero-Caceres*, 2018 WL 6059381, at *1 (E.D. Va. Nov. 19, 2018); *U.S. v. Romero-Colindres*, 2018 WL 5084877, at *1 (N.D. Ohio Oct. 18, 2018). That is not the case here. Given the fact that there is no evidence in the record to indicate that defendant received notice of the date and time of his removal hearing, the Court must find that the NTA was statutorily deficient and that defendant did not receive proper notice of his removal hearing.

But just because defendant never received statutorily valid notice of his removal hearing does not mean that his collateral attack automatically succeeds. The question of whether an alien defendant is exempted from having to satisfy the three requirements of 8 U.S.C. §1326(d) when the underlying removal order is void because of lack of notice has split District Courts around the country. Some courts have held that an alien is exempt from satisfying §1326(d) if he can show that his underlying removal order was void for want of notice. *See, e.g.*, *U.S. v. Virgen-Ponce*, 320 F. Supp.3d 1164 (E.D. Wash. 2018); *U.S. v. Cruz-Jiminez*, 2018 WL 5779491 (W.D. Tex. Nov. 2, 2018). On the other hand, many other courts have found that a defendant still must satisfy those requirements regardless if his underlying removal order was somehow invalid. *See, e.g.*, *U.S. v. Zapata-Cortinas*, 2018 WL 6061076 (W.D. Tex. Nov. 20, 2018); *U.S. v. Romero-Caceres*, 2018 WL 6059381 (E.D. Va. Nov. 19, 2018); *U.S. v. Mendoza-Sanchez*, 2018 WL 5816346 (D.N.H. Nov. 5, 2018); *U.S. v. Hernandez-Velasco*, 2018 WL 5622285 (W.D. Okla. Oct. 26, 2018); *U.S. v. Romero-Colindres*, 2018 WL 5084877 (N.D. Ohio Oct. 18, 2018); *U.S. v. Larios-Ajualat*, 2018 WL 5013522 (D. Kan. Oct. 15, 2018).

The Court finds the latter view far more persuasive and better supported by a plain reading of §1326(d) and the history behind its creation. As both the District of Kansas and Western District of Texas explained in their opinions, in *U.S. v. Mendoza-Lopez*, 481 U.S. 828 (1987), the Supreme

Court examined a prior version of §1326 that did not contain §(d). *U.S. v. Zapata-Cortinas*, 2018 WL 6061076, at *8 (W.D. Tex. Nov. 20, 2018); *U.S. v. Larios-Ajualat*, 2018 WL 5013522, at *4 (D. Kan. Oct. 15, 2018). In that case, the respondent aliens attempted to challenge the validity of their underlying removal orders, but as the Supreme Court noted, the "text and background of §1326" indicated that Congress never intended to "sanction challenges to deportation orders in proceedings under §1326." *Mendoza-Lopez*, 481 U.S. at 837. The Supreme Court believed that this was an error on Congress's part because when an administrative decision plays a "critical role" in the subsequent prosecution of a criminal offense, "there must be *some* meaningful review of the administrative proceeding." *Id*. at 837–38 (emphasis in original). Not having such an avenue for review is a due process violation. *Id*. at 837.

In response to the Supreme Court's holding in *Mendoza-Lopez*, in 1996, Congress amended §1326 to add in §(d). *See U.S. v. Benitez-Villafuerte*, 186 F.3d 651, 658 n.8 (5th Cir. 1999) ("Congress effectively codified our reading of *Mendoza-Lopez* in §1326(d)"). The fact that Congress specifically added §1326(d) in response to a case where multiple criminal defendants had alleged that their prior removal orders were invalid indicates Congress did not intend for aliens like defendant here to avoid §(d)'s requirements in any circumstance. Simply put, a prior lawful removal order is not a perquisite for a conviction for illegal reentry charge under §1326(a). The argument that a defendant alien cannot be convicted of a §1326(a) illegal reentry charge based on an unlawful predicate removal order has previously been rejected by several Circuits. *See, e.g.*, *U.S. v. Earle*, 488 F.3d 537, 547 (1st Cir. 2007) ("In an illegal reentry prosecution, the lawfulness of deportation simply is not an element of the offense."); *U.S. v. Paredes-Batista*, 140 F.3d 367, 366 (2d Cir. 1998) ("Section 1326 does not, on its face, require that the earlier deportation have been "lawful" to support a conviction for illegal reentry."); *U.S. v. Murguia-Marquez*, 687 Fed. App'x. 736, 738 (10th Cir. 2017). Defendant thus cannot bypass §(d)'s stringent requirements because his January 2009 removal order was invalid for lack of notice or any other reason. And as the Court determined in the previous section, defendant has failed to demonstrate that he either meets or, under Ninth Circuit precedent, is exempted from meeting the requirements of §(d). The Court will accordingly deny his motion to dismiss.

### IV. Conclusion

IT IS THEREFORE ORDERED that the government's motion to strike (ECF No. 27) is DENIED.

IT IS FURTHER ORDERED that defendant's motion to dismiss (ECF No. 16) is DENIED.

IT IS FURTHER ORDERED that the parties are to jointly contact the undersigned's courtroom administrator, Jennifer Cotter (Jennifer_Cotter@nvd.uscourts.gov), by email with an update on the status of the case within 14 days of the entry of this order.

IT IS SO ORDERED.

DATED this 4th day of February, 2019.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE